Case number 24-5125. Katherine J. Mera, affelent, versus Pamela Bondi. Mr. Swick for the affelent, Mr. Silverman for the affiliate. Good morning Mr. Swick. Good morning. You may proceed when you're ready. Thank you. We're here because the district court erred when it improperly applied the discrimination of L9, retaliation of L9 stage of the case. In this case, Ms. Mera complained about disability discrimination and retaliation. Appellees responded that she was fired because she failed PIP. And so the issue now is discrimination, retaliation of L9. The kind of jumped to the conclusion that because she failed the PIP, there couldn't be any discrimination or retaliation. But that's not, that's not what the law is. And in the George v. Leavitt case, the court makes clear, that's at 405 F3rd and page 415, the court makes clear that, well two things. One is that the, just because the reasons are true, or not false, doesn't mean there's not a discrimination, retaliation. And on the other hand, as the appellee argues, even if the reasons aren't true, like the subjective feelings of the deciding official, what matters here. We would submit that it's clear that as of June of 2018, Ms. Mera didn't have performance problems. There was a mid-year evaluation done at that time. It's a kind of a friendly back-and-forth. Ms. Mera thanking her supervisor Darlene Johnson and no indication that there's any unsatisfactory performance. At the same time almost, there's a discrimination case pending regarding the accommodations that Ms. Mera requested. And there's a settlement of that also in June of 2018. At that time, there's a written agreement comes forward from the and there's immediate pushback from the supervisor Darlene Johnson about how much accommodation, what the accommodation is going to be. And then there ends up being extended email back and forth trying to work out, you know, what the accommodation is going to be. And it's not really until October 5th, 2018, that they finally come to a resolution of what the accommodations should be. Within days of that, there's like a series of hostile type actions towards Ms. Mera beginning on October 12th. And there's the issue about complaining about micromanaging. But more startling, what happens is in, I think it's on November 17th, more than a month and a half after the end of the performance period, Ms. Johnson issues a mid-year performance evaluation. And I don't think that any juror looking at that is going to think, how do you get, you know, how do you get your mid-year evaluation two months, month and a half after the period has ended completely? But that's what happened. And then, you know, the evaluation gets put off for six months. And then no surprise that the evaluation was finally done May 16, 2019, as unsatisfactory, which launches the PIP. And it's interesting, I think when the Civil Service Reform Act was first passed, the idea of a PIP genuinely was that supervisors would help their struggling subordinates to improve their performance. But I think that's a myth. And in practice, you know, the performance improvement plan is just a precursor to a termination, which is what happened here. Now, if we look at it in the light of the performance improvement plan coming after the mid-year done, after the close of the rating period, and the performance appraisal done six months after the mid-year based on stuff outside the rating period, I think it's a good reason to question some of the things that happened at PIP. In order for us to reverse under our case law, we're doing, we're performing de novo review. And we have to conclude, don't we, that the deciding the things that she wrote in upholding the termination recommendation, right? Isn't that our standard? Sort of, but not completely. As far as the deciding official, Mary Powers, she essentially just rubber-stamped what Ms. Johnson said. To answer the question, as a legal matter, what do you believe you have to establish to convince us to reverse? Well, also in the George versus Levy case, the court talks about if there's a subordinate official, like Darlene Johnson, that influences the deciding official, then there's a basis for discrimination or retaliation based upon that finding. I think that's at 405 F3rd. I saw that. That's your kind of alternative backup argument, the cat's paw theory. Yes. But your primary theory, I mean, if you don't want to talk about the primary theory, that's fine, but I thought your primary theory was not cat's paw, but that just basically the decision didn't meet the framework. I'm trying to get you to focus on why we should find that. Why is it that even if Ms. Powers honestly and reasonably believed what she wrote, nonetheless there was enough evidence of pretext there to overcome that finding, or we should just not find that she honestly and reasonably believed what she wrote? Well, if we take Ms. Powers at her word in the very first page of her decision, she says, I'm not going to address the discrimination and retaliation, and that's really the foundation for the defense, that there's discrimination and retaliation going on, and you have to look at the, you know, the charges by Ms. Johnson in light of the background of the discrimination and retaliation. I think that Ms. Powers should have said, well, because Ms. Mira is concerned about whether Johnson is discriminating and retaliating against her, I should kind of factor that in when I evaluate her performance. Yes, in a way, because what Ms. Powers should do to say, okay, the employee here, Ms. Mira, is contending against the, you know, offering responses, the court kind of faults us because we responded to all that stuff, but offering responses to the charges against her, but the key to her thing is that, or her contention, is that these are all motivated by discrimination and retaliation. You have to see that background when you look at the allegations, because you take, like, okay, one of the allegations is that Ms. Mira, she did like 60 reviews, and Ms. Johnson said she looked at six of them, found three or more errors in three of the six she looked at, and therefore she failed to pick up on that point. Okay, but if Ms. Mira thinks these are minor errors and there were a few of them, that's her response, but the point is, if these are really serious errors, why didn't she look at the other? One of the difficulties is, you know, the cases that govern are very clear that the court doesn't sit as a, you know, super personnel department to re-evaluate what we would have done had we been running the workplace, and that's where the standard that Judge Wilkins mentioned comes into play, that, you know, to overcome summary judgment, it's your burden to show a genuine factual dispute as to whether the deciding official, and here that's Powers, or even sort of combining with the cat's paw theory, Johnson and Powers, have you shown that the deciding official or officials didn't honestly and reasonably believe their reasons, their assessment that Ms. Mira did not successfully complete her PIP, and if they were honest and reasonable in coming to that conclusion, then it doesn't matter that Ms. Mira thinks, well, you should have evaluated it differently, and it seems like a lot of the argument in the briefing and in the response to the defendant's statement of material facts not in dispute is, no, that's her version, my version is different, and I think the question that we're asking here is, do you agree that that's not enough under the law for her to say, yeah, I get it that she thought that, but my version is different, and my version is more persuasive? Is that the... When you say my version, you're speaking... Mira is saying her version is more persuasive. Well, it depends on which of the things you're talking about. So let's say the red books, which the district court talked about in some detail. Okay, the red books, Ms. Mira had been doing red books for years, and her red books had always been satisfactory in the past. There was no change in the SOP or anything. She did the red books pretty much how she had always done. The defense puts in evidence that there were content errors. I'm not sure I'm going to get the details correct, but, you know, a misstatement of an address or, you know, content errors, and the only thing I can say is that she never addresses the notion that there were actually substantive errors in those. And she just sort of says, like, oh, we had back and forth, but the employer is saying, for my purposes, multiple rounds of edits and changes on this body of work that she should know how to do. She's been doing it for 20 years. The employer says, I'm not satisfied with that. And I guess the question is, what is the evidence that Johnson saying and powers affirming, that's not satisfactory, is, other than, like, tightening up the management, but is actually retaliatory. How do we infer that the intent was not a good faith evaluation of, like, is this the way we want to get the work done, but was actually biased against Ms. Mehra because of her EEO activity? What's the evidence that's really going on? I think the best evidence of that is the timing of the PIP, and the fact that the mid-year is done a month and a half after the end of the rating period, not at the mid-year, but a month and a half afterwards, and then there's an unsatisfactory performance six months following that. That, I think, is evidence that Ms. Johnson decided to fire Ms. Mehra, and the PIP was just a matter of going through the motions. Now, the thing you mentioned about the address being wrong, that is a mistake, and it was corrected when it was caught, but the point of it is, there's a standard working now that wasn't working for the last 10 years that these folks have to have every detail correct, and why has Ms. Johnson now adopted that standard and applied it to Ms. Mehra under the circumstances? The reasonable inference is because she decided to fire her back in November of 2000. But was there evidence that a different standard was being applied to Ms. Mehra than was applied to other employees? There's no evidence about that. The evidence is that a different standard was applied to Ms. Mehra than had been applied in the past. So, let's assume this hypothetical question. There's an employee that, you know, everyone likes them, but they've been doing things wrong for 20 years, and then there's an edict from on high that we need to have everyone do everything correctly, and as a result, you know, year 21, that employee is found to have made mistakes, and as a result is let go. Is that discrimination or retaliation? Well, it couldn't be retaliation unless you had other circumstances to show retaliation, you know, protected activity. As far as discrimination goes, if it's a legitimate thing, if there really was an edict from on high, which we didn't have here, but just even a change in Ms. Johnson's viewpoint, then it should have showed up in the mid-year that was done in June of the actual rating period, and, you know, that's the purpose of the mid-year is to give the employee a chance to correct things. Here, Ms. Mehra is reluctant even to talk to Ms. Johnson about things because Ms. Johnson gets mad at her for asking her questions she thinks she should know the answer to. But the collective bargaining agreement, you have to give notice during the mid-year if you're going to bring an unsatisfactory performance. Was there a grievance on that point, if the collective bargaining agreement required the evaluation to be done by a certain point? Is that something that would be subject to grievance? Well, it was done by the point, they just did another one. It was done by the point, and then they just did another one after, you know, seven and a half months later. And the reason in the record that the employer gives for the delay was just wanting to clearly separate the issue of the use of the government credit card and just resolve that. And it took some iterations and the suspension was diminished and it was resolved. And, you know, they wanted to have that just dealt with before doing the evaluation. And I think the only thing I read in the record that Ms. Mira rebutted that as the legitimate non-retaliatory reason for the later timing was, well, that misconduct was separate from performance. They should have just done them both at the same time. They're separate tracks. You know, that doesn't imply that it was bad fate, that it was a sort of part of a setup for retaliation for the employer to have decided otherwise. Let's just clear the air on this and then we'll be able to separately and independently deal with the workplace issues. And you can question that subjectively, but I don't think we can question it without evidence that takes Ms. Mira's disagreement with that and gives us a reason to think that she's pointed to something that actually shows retaliation. You can say this is ridiculous, which it was. I mean, I mean. It's ridiculous. It's ridiculous to think that you should have one out of the way before you do the other. Is that what's ridiculous? Which one? They already did that mid-year. Right, but to have the credit card. The credit card was resolved. She did her job. And then after that, admittedly, belatedly turned to the performance review. Is that what you were saying? I'm saying one of them has nothing to do with the other. I know that's Mira's position is that they're two separate things. One has to do with them. You don't have to be a super personnel board to see that. Well, no, because how the employer completes its tasks is part of how an employer runs an office. And I gather some of the same are involved in both. And it's taking a certain amount of interaction and probably creating a certain amount of innervation on the part of supervisors. And to me, it seems not implausible that that's a good way to proceed. Keep something that would feel might make you feel negatively toward an employee and just close the door on that before you get into evaluating. The door was closed six months earlier when the punishment was finally determined. So now it's time to do her evaluation. And where's the justification for doing a second mid-year when you're already done one? And I just think that that's inherently suspect that it's like turning a blind eye to things that are inherently suspect to say that you can do the mid-year evaluation a month and a half after the end of the rating period. Mid-year is at the middle, not at the end. So I think that's. And why? I mean, that may be not dotting your I's and crossing your T's as an employer. Why is it evidence of retaliation? Why is that the deficiency that it reflects as opposed to just they weren't prioritizing it? They'd already done it. Why'd they do another? Right. But why is the reason when you say this is inexplicable, why is the reason you fill in there because other than this is just they're not prioritizing things that Miss Mira might need, but that the reason they're not prioritizing it and they're not more prompt is because they're out to get her because she exercised her EEO rights. That's what we as a court need to be able to point to. Because of the pushback that started in August of 2018 where Miss Johnson is not approving. I mean, I can understand the way. I mean, she probably wasn't involved in the actual settlement, but someone comes back and starts to live with and she was not happy about it. And that's evident going back and forth. And then in the end, you know, Miss Mira pretty much gets her away. That's that. But that is, I mean, accommodation is a process. And I understand that the decision was made what the accommodation would be, but then to implement it, the fact that there's communication about it is in your view enough to raise an inference of retaliation. It's the fact that there's communication by Johnson I would say disagreement, but even if, or disagreement, even if she's got remote work, what about these times when we tend to do things in person? Like if I ask that question as a supervisor, that itself raises an inference of retaliation. No, but then if right after doing that, you decide to do the extraordinary thing of a mid-year evaluation a month and a half after the rating periods ended, I mean, there's something, there's something wrong there. One of the, you mentioned that the main evidence of retaliation is the timing that, you know, it was after Miss Johnson was unhappy. And we do routinely recognize that at the prima facie stage, when we're on summary judgment with the full record, our cases say that you have to have positive evidence beyond mere proximity to show that an employer had a retaliatory or discriminatory motive. And so I guess that's what this discussion has been. Can you identify what's the best evidence, one, two, or three pieces of evidence that are the best evidence beyond the mere proximity of Ms. Mera's EEO activity and the termination? You're asking for the best evidence of a retaliatory motive. Beyond mere proximity. Well, the action itself is evidence of it. It's extraordinary that. Which action are you referring to? The action during the mid-year, a month and a half after the end of the rating period. And how did that disadvantage Ms. Mera? She had a relatively positive mid-year at the mid-year, and now she has a so-called mid-year where Ms. Johnson writes all these notes to herself. Yeah, that's, that's. Are you talking about the PIP? I'm not sure. Yes, when she, yeah, in November 2017, I think the first PIP was in June. And then there's the email exchange on that, that actual PIP, I should say. And then the, whatever the new PIP, the after the fact PIP, the exit, you know, that's done on November 17th. The rating period ended September 30th. How can that be a PIP? I mean, how can that be a mid-year evaluation? It's just a little bit delayed. It's a mid-year evaluation. It's evaluating conduct that was done in the first part of the year, but it's a bit delayed. Not evaluating conduct, it's about performance. Performance, right. Conduct of, in the job. Right. In the job. And it replaces one that found no articulated performance problems that was done at the time it was supposed to be done. And it now comes up with them, you know, after the immediate experience of having this disagreement, dissatisfaction by Ms. Johnson with the accommodation being granted. Ms. Merritt needed accommodation. I, you know, sometimes think you tell clients, well, can you just try to live with it how it is? Because, you know, they're not going to like it if you push this. But she needed it. I couldn't, it's not something you could have told her. Yeah. Other questions? All right. Thank you. Had you reserved rebuttal time? One minute. All right. Even though we've taken you beyond here a lot of time, we will give you the rebuttal. Thank you. Thank you. Mr. Silverman. Good morning, Your Honors. Bradley Silverman for the Attorney General. This case began with a large number of discrimination and retaliation claims based on a number of different arguments, actions, but has narrowed to a single question, whether Ms. Merritt's termination was retaliation for protected activity. Mary Powers, the deciding official, provided a detailed, reasonable explanation for her decision to remove Ms. Merritt from federal service, and Ms. Merritt fails to show a genuine issue as to whether that explanation was pretextual. Over the course of her 12-page memorandum, Ms. Powers reviewed the 13 HIPAA tasks that Merritt needed to perform. She determined that Ms. Merritt failed to adequately perform seven of those 13 tasks. Importantly, she did not take issue with Merritt's factual account of what happened, and she cut Merritt several breaks along the way, such as, for example, not holding it against Merritt that Merritt did not attend the monitoring visit due to what Merritt said was a medical issue. Ms. Merritt's arguments that this amounted to pretext, generally speaking, fall into two broad buckets. First, she argues that her performance simply was satisfactory, but an employee's own assessment of her own performance is insufficient to give rise to a genuine issue as to pretext, as this court repeatedly has held. Second, she acknowledges at times that there were some areas where her performance falls short, but nonetheless said that it was good enough and says there were some extenuating circumstances and that this should not be deemed so bad as to justify firing her, but this court repeatedly has rejected exactly that kind of argument. At the end of the day, Ms. Merritt's argument boils down to the contention that she should not have been fired, that her performance was good enough. Whether or not that's right or wrong, it does not suggest retaliation or protected activity. Bracketing whether it does on this record, just as a matter of what the doctrine is, said that, you know, she contests and says her performance was satisfactory. If her performance was actually, I mean, you have to, as a plaintiff, get into the weeds a bit on those issues. If the employer says, you know, this, this, this, and this were wrong, and you as the employee, you know, of course the employer is the judge of what the employer wants, but if you as an employee can point out that the nitpicking was, you know, trivial in the extreme and that your version is credible, doesn't have to be definitive at the summary judgment stage, that somebody could agree that your version, I knocked myself out, I did as good or better than I was doing in the past, you know, there were two spelling errors, and suddenly this was seen as, you know, a fireable level of performance. So clearly the, her account is relevant, right? Her, her disputes about whether or not she performed, that's relevant to a retaliation claim, In theory, an employee's performance can be so plainly strong and the employer's accounts of her performance so plainly erroneous that the sheer mismatch between what is obvious from the record and what the employee's, the deciding official's decision says is so great that that could suggest retaliation. That is why this court has required that an employer honestly and reasonably believe its stated reasons, because in theory an employer's reason might be so unreasonable that just no one could, no one could really believe that that's what's happening here. But nothing like that happened in this case. Here, if you look at each of the seven tasks that Powers determined Mara failed, Powers' explanations are reasonable, they, they're logical, and Mara importantly does not take issue with Powers' factual account of what happened. So just to return to the, the redbooking example, this task required, this task provided that a single redbook with more than three errors constitutes failure. Mara does not dispute that there was at least one redbook with more than three errors. Instead, she argues, well she really makes two arguments. One, she says these errors were stylistic in nature, but even putting aside the fact that her own assessment of her own work is insufficient to give rise to a genuine issue of pretext, the errors that Powers identified in the redbooks plainly went well beyond stylistic quibbles. These were serious substantive errors and omissions that an experienced grant program specialist should have known to avoid. Mara also argues that she received insufficient training on redbooks. Again, not disputing that there were at least one redbook with more than three errors, which under the language of the task constitutes failure, but says she didn't have enough training. And Powers explains there are two problems with this argument. First, it is undisputed that Mara in fact was provided training in May 2019, which is three months before she was placed on the PIP at a JA, I believe 762, in her response to the government statement of undisputed material facts. Mara concedes that fact. So she did in fact receive training fairly recently before she was put on the PIP. But even zooming out and looking at the bigger picture, this is an employee who had been in this job for 20 years generating redbooks, nine of which were Johnson's supervision specifically. So as Powers reasonably explained, this is someone who understood what or should have understood what a redbook required and specifically understood what this particular supervisor, Ms. Johnson, expected of a redbook. Now whether or not Mara agrees or disagrees with that explanation, nothing about Ms. Powers' reasoning here is so bizarre or incredible as to give rise to an inference of pretext. I take Mr. Swick's principle pushback on that, that Ms. Mara had a satisfactory job evaluation quite recently prior to the PIP. And so his inference that he would have us draw is she was doing the job for the PIP. And it was frustration with her EEO activity that pushed Johnson to tighten up the stand and find Mara. And your best response to that is? Well, this court in the Carpenter case has rejected virtually that exact argument. There, the plaintiff argued that she previously had received a five on a certain task and her performance had not changed. And so therefore she has to have earned a five for this period as well. And this court rejected that argument because it presumes that performance does not change over time. And we just, we know that's not true. Each performance period is judged independently from the previous one. So the fact that one's performance was adequate the last time doesn't necessarily mean that it's adequate this time. I would also note that the undisputed evidence in the record, Johnson's testimony, Johnson testifies that she had in fact initially been planning to rate Mara as unsatisfactory for the 2016-17 period. But she decided to cut Mara a break, wipe the slate clean because the misconduct inquiry had just ended. So Johnson decided to give Mara another chance essentially to clean all that up. And that is shown not only in Johnson's deposition testimony, but also her contemporaneous email at the time, JA394. She's sending an email about Johnson's, sorry, Mara's then in the works 2016-17 performance evaluation. And she says that she's planning to rate Mara unsatisfactory. Now we know that did not end up happening. I'm happy to take any questions the court has. Thank you. Thank you. Mr. Swick, you don't have to give a rebuttal if you don't want to, but you have a minute if you'd like to. I'll say three things in one minute. I think I'll just stick with one. The case that the council cited where an employee argues that they should be outstanding this year because they were outstanding last year. And this year they only got excellent. That really doesn't compare to saying, you know, you were satisfactorily last year, this year you're going to get fired. But the judgment is for the supervisor. It is for the manager to make what's satisfactory and what isn't. But in Ms. Mara's view of her work isn't the key of it. What the key of it is, is her testimony about what the standard had been. And if the standard has changed, that something that used to be satisfactory is unsatisfactory and you're going to be fired. She's as competent as anybody else to say what standard she was held to the last time. And here the standard did change. There's no, you know, there's no edict from above or anything like that. There's going to be no standard. But I have just one question on that. If an employer decides that it's been too sloppy in the supervision that it's doing and it decides to be more demanding, then for an employee who suffers from that to show that it's retaliation against her, she would have to show that other employees were not, more was not similarly demanded of other employees. That it wasn't a genuine across the board, come on, pull up our sock, but something targeted at her because of her protected activity. And we don't have any comparative evidence in this case. No, we don't. And this is not a case for comparative evidence. But what, under the scenario that you're describing, where the employer says, you know, like the council said, well, I was thinking about giving her an onsite last year. So, you know, this year I'm going to, well, then it should have showed up in the PIP. Or not the PIP, excuse me, I keep saying that. The midyear. It should have showed up in the midyear at the midpoint. You know, notice, look, you know, you're not cutting it here, you got to buck up. It wasn't a glowing evaluation as I read it. It was quite, I mean, if you're reading that as an employee who has gotten better evaluation in the past, you would draw, or you could readily draw a message from that, this is borderline performance. Well, I don't think so, because of the tone. And you understand this isn't the email back and forth. That's not the midyear, they talk. No, I know, there's an actual evaluation. There's conversation. And Ms. Mira's email reflects that she came away with it, like with a positive view. All right. Any other questions? Thank you very much. The case is submitted.
judges: Pillard; Wilkins; Edwards